## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| TAYMARI DELGADO ECHEVARRIA, | |
| Plaintiff, | |
| v. | CIVIL NO. 13-1160 (PAD) |
| ASTRAZENECA, LP, <u>ET AL.</u> | |
| Defendant. | |

### OPINION AND ORDER

Delgado-Hernández, District Judge.

Plaintiff Taymari Delgado-Echevarria initiated this action against her former employer, AstraZeneca Pharmaceutical LP, complaining of age and disability discrimination, hostile work environment, interference with a protected leave of absence, retaliation, tortious conduct, and unjust discharge under various federal and Puerto Rico statutes.[1]  Before the court is AstraZeneca's Motion for Summary Judgment (Docket No. 97).  For the reasons explained below, the motion is GRANTED and the case DISMISSED.

### I.    BACKGROUND

Plaintiff alleges that after years of impeccable employment history with AstraZeneca, she disclosed to her immediate supervisor some medical problems to justify days off for treatment. Then, she claims, the supervisor engaged in a pattern of intense harassment and adverse employment actions in an attempt to fabricate a negative employment record and force her resignation. The pattern exacerbated her conditions to the point where she had to apply for a

---

[1]  To wit, the American with Disabilities Act, 42 U.S.C. § 12101, <u>et seq.</u>; the Family and Medical Leave Act, 29 U.S.C. §§ 2612(a)(1)(D), 2614(a)(1) and 29 C.F.R. § 825.220(c); the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, <u>et seq.</u>; P.R. Law No. 44 of July 2, 1985, P.R. Laws Ann. tit. 1 § 501, <u>et seq.</u>; P.R. Law 100 of June 30, 1959, P.R. Laws Ann. tit. 29 §§ 146, <u>et seq.</u>; P.R. Law No. 115 of December 20, 1991, P.R. Laws Ann. tit. 29 §§ 194, <u>et seq.</u>; Law No. 80 of May 30, 1976, P.R. Laws Ann. tit. 29 §§ 185a <u>et seq.</u>; and Articles 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 §§ 5141 and 5142.

Taymari Delgado-Echevarria v. AstraZeneca, LLP, *et al.*
Civil No. 13-1160 (PAD)
Opinion and Order
Page 2

disability leave of absence, and AstraZeneca granted the leave but refused to authorize an

extension, instead terminating her employment without affording her reasonable accommodation

(Docket No. 1 at ¶¶ 16-21, 30, 62).  AstraZeneca denied liability, and following discovery moved

for summary judgment (Docket No. 96).  Plaintiff opposed AstraZeneca's motion (Docket No.

114), AstraZeneca replied (Docket No. 123) and plaintiff surreplied (Docket No. 129).[2]

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to

interrogatories and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(c).  The purpose of summary judgment is to pierce the pleadings and

assess the proof in order to see whether there is need for trial.  Mesnick v. General Electric Co.,

950 F.2d 816, 822 (1st Cir. 1991).

The party moving for summary judgment bears the initial responsibility of demonstrating

the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

A factual dispute is "genuine" if it could be resolved in favor of either party.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 249 (1986).  It is "material" if it potentially affects the outcome of the

case in light of applicable law.  Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir.

2004).  As to issues on which the nonmovant has the burden of proof, the movant need to no more

than aver absence of evidence to support the nonmoving party's case.  Celotex Corp., 477 U.S. at

325; Mottolo v. Fireman's Fund Ins. Co., 43 F.3d 723, 725 (1st Cir. 1995).

---

[2] In her opposition, plaintiff withdrew the ADEA claims and the claims under P.R. Laws 100 and 115 (Docket No. 114 at p. 2 n.1).
Accordingly, those claims will be dismissed with prejudice.  The court will limit the discussion to the merits of plaintiff's
outstanding claims.

Once the moving party has satisfied this requirement, the nonmoving party has the burden of presenting facts that demonstrate a genuine issue of material fact for trial.  LeBlanc v. Great American Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  All reasonable factual inferences must be drawn in favor of the party against whom summary judgment is sought.  Shafmaster v. U.S., 707 F.3d. 130, 135 (1st Cir. 2013).

To resist summary judgment, the nonmovant must do more than show some metaphysical doubt as to a material fact.  Matsushita Elec. Inds. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative will not suffice to ward off a properly supported motion for summary judgment.  Nieves-Romero v. U.S., 715 F.3d 375, 378 (1st Cir. 2013).  Careful record review reflects absence of genuine dispute as to the facts identified in the section that follows.  Based on those facts, AstraZeneca is entitled to judgment as a matter of law.

### III.       FINDINGS OF FACT[3]

### A.  The Parties

AstraZeneca is in the business of developing, producing, manufacturing and marketing prescription medications.  See Docket No. 96, Exh. 1 "Defendants' Statement of Uncontested Facts in Support of Motion for Summary Judgment" ("SUMF") at ¶ 1.  During the relevant period, its Regional Sales Director for Puerto Rico was Elsa Saavedra. SUMF at ¶ 11.

Plaintiff was employed by AstraZeneca as a Pharmaceutical Sales Specialist – a sales representative – in 2001.  SUMF at ¶ 8.  She was responsible for management of a sales territory

---

[3] The parties submitted more than 500 statements of fact (including proposed statements of fact, opposing statements, reply statements and sur-reply statements) and over 1,500 pages of supporting documents, some of which are irrelevant for purposes of summary judgment. Although the court reviewed those materials, it will only consider and include in this Opinion and Order those facts that are material for purposes of summary judgment as mandated by Fed.R.Civ.P. 56. Moreover, the court will not incorporate statements pertaining to the claims plaintiff withdrew.

Taymari Delgado-Echevarria v. AstraZeneca, LLP, *et al.*
Civil No. 13-1160 (PAD)
Opinion and Order
Page 4

and her primary duties included sales and customer service. SUMF at ¶ 9.  In 2009 she was

promoted to a sales representative position in the newly created Hospital Division.  SUMF at ¶ 16.

Her duties did not change but the products she was responsible for did.  SUMF at ¶ 17.[4]  In the

new position, she was assigned a hospital territory called "Hospital CV East," covering various

hospitals in the municipalities of Caguas, Cayey, Aibonito, Juncos, Las Piedras, Humacao and

Fajardo. SUMF at ¶ 16. She was supervised by AstraZeneca's Executive District Manager, Maribel

Martínez, who in turn, reported to Saavedra.  SUMF at ¶ 18.

### B.  Performance Evaluations

Sales representatives are subject to mid-year and annual evaluations, and monitored by

way of a "Field Coaching Form."[5] SUMF at ¶¶ 26, 28.  The Form is prepared by the

representative's superiors to record the representative's performance and presentation during field

rides (e.g. visits to customers).  SUMF at ¶ 29.  Field rides are conducted to evaluate the

representatives' strengths and weaknesses.  Id.  The information recorded is made part of the

representative's annual performance evaluation. SUMF at ¶ 32.

### C.  Plaintiff's performance

In the Form corresponding to the April 12, 2010 field ride, Martínez recorded that plaintiff,

partially met expectations in four (4) out of the five (5) areas.  SUMF at ¶ 33.  She stated that

plaintiff's "focus should be to the top customers to the specific objective and the simplicity of the

conversation so the features and benefits of our portfolio begins to be the solution for the

customers."  Id.  Further, she pointed out that plaintiff had to "plan for the objective to be clear and

---

[4] Plaintiff denied the statement, but only to clarify that her duties in this new position did change, as her territory was larger (more municipalities/towns were added to her route and that a new products were added to her list)(Docket No. 101 at ¶ 17). It is uncontested, however, that she continued performing the duties of a sales representative.

[5] The forms are also known as AstraZeneca Selling Approach. SUMF at ¶ 28.

simple, follow up on the rearrangement of routing so you impact those top customers with the right reach and frequency,  important to allocate the resources since the beginning of the month so you are giving the tops  the most [sic] of the resourc [sic].” Id.  The Forms corresponding to the field rides of May, June, and July 2010, reflect plaintiff's generally meeting expectations.  As to the form corresponding to the field ride of October 5, 2010, it reveals that plaintiff's overall performance did not meet expectations.  The Form corresponding to the February 24, 2011 field ride identifies several areas on need of improvement, such as uncovering need, develop a conversation, and help customers choose the appropriate patient.

In the form following the March 21, 2011 field ride, Martínez recorded to have discussed with plaintiff the importance of appropriate patient description for the portfolio; symptoms description depending on customer needs; and post-analysis of call as key to progress.  In the Form corresponding to the April 28, 2011 field ride, she recorded that plaintiff needed  development in being more specific while doing opening statements; in focusing on the specific patient type; in bringing in solution; and in closing.  Also, she highlighted plaintiff's need to have a specific objective and to deliver it in a concise manner. Id.

In the Form corresponding to the May 23, 2011 field ride, Martínez recorded that plaintiff “needed improvement” on the “[a]ble to articulate in  a clear and concise manner” area.  In the “[c]onsider the following when creating action steps” section, she stated that plaintiff needed to be more specific while doing the opening statements, in focusing on the specific patient type, bringing the solution and the patient discussed to round the commitment, and closing, amongst others (Docket No. 96, Exh. 17 at p. 3).  In the Form corresponding to the June 13, 2011 field ride, she recorded that plaintiff needed to develop “focus on the post-call, the openings and the

conversations to f/u next visit, and therefore being more assertive in filling the need." SUMF at ¶ 40. She gave plaintiff a "needs improvement" on the "Close the Call" criterion. Id.

The 2011 mid-year review placed plaintiff's portfolio under expectations as of April, 2011, with products losing share. She was so informed and advised of the need to take ownership and accountability for success factors and career development. SUMF at ¶ 41.

In the Form corresponding to the July 11, 2011 field ride, Martínez recorded that plaintiff needed to develop rounding and closing in patient described (Docket No. 96, Exh.19). Between August and September 2011, Brilinta became plaintiff's primary product. SUMF at ¶ 44. In the Form corresponding to the August 18, 2011 field ride, she stated to have discussed with plaintiff concision in conversations, that plaintiff had improved a lot, that being specific would help her accomplish two product discussions, that pre-planning would be crucial in defining openings and in engaging in questions to leverage in the new portfolio. Docket No. 96, Exhs. 20 and 30.

On September 9, 2011, Saavedra sent an e-mail to plaintiff with her feedback on a field ride they went together on Tuesday of that same week (Docket No. 96, Exh. 6). She pointed out that in order for plaintiff to continue her development with the product Brilinta and be more effective, in a nutshell, she had to become more product knowledgeable. SUMF at ¶ 45.

In the Form corresponding to the September 29, 2011 field ride, Martínez gave plaintiff "needs improvement" ratings on "Pre-Call Plan" and "Post Call Evaluation." SUMF at ¶ 46. She recorded to have discussed with plaintiff several aspects of the territory performance, recommending better pre-planning to accomplish better coverage. She added that with the new STP[6] it was going to be crucial to pre-plan for better coverage and individualization of customers'

---

[6] It is unclear from the record what "STP" stands for.

need, that preplan was the basis of any assessment to help plaintiff with customer objections for their patients, and that plaintiff should practice the indication for Brilinta so the call flowed easier.  She identified as action steps: pre-call planning to anticipate challenges; new STP to give plaintiff the opportunity to identify priorities based on Hospital's need; focusing on next call objectives; and considering it a priority the documentation of actions taken with accounts.

In the Form corresponding to the October 19 and half of October 20, 2011 field ride, Martínez recorded that plaintiff needed improvement on pre-call plan, in customer interest and time, in transitioning to second product, in stating appropriate patient type/need for second product, in selling through approved messages for second product, in closing on all products, and in post-call evaluations.  As "action steps", she specified that pre-call planning needed to improve in order to better target accounts, and identified prioritized customers to make better decisions, need to focus in concise conversations that can support two product discussions, and need to review and implement IDP (Docket No. 96, Exh. 22).[7]  Further, she mentioned "Pre-call planning to anticipate route challenges. New STP will give PSS opportunity to id priorities based on hospital needs. KI[8] is a key piece in PSS's daily work.  Documentation and/or actions taken w/ accounts is a priority. Focus on next call objectives." Id.  The same day, plaintiff notified Martínez of the tumor.  Martínez said it was nothing.

On October 21, 2011, Martínez sent an e-mail to Michael Cohran, Senior Employment Practices Partner in Human Resources for AstraZeneca assigned to work with human resources related matters in Puerto Rico, informing him (1) of plaintiff's performance difficulties; (2) that

---

[7] Which stands for the "Individual Development Plan." See, Docket No. 96, Exh. 21 at p. 2 (AZ-0000588).

[8] It is unclear from the record what these initials stand for.

Martínez had coached plaintiff several times; and (3) that plaintiff's performance had not improved.  SUMF at ¶ 50.[9]

In late October-early November, Cohran had a phone conversation with Martínez to discuss her concerns about plaintiff's impact and influence on customers.  SUMF at ¶ 52 and Docket No. 101 at ¶ 52.  There was a new selling strategy in AstraZeneca with regards to the new product, Brilinta, and concerns about plaintiff's ability to evolve and to change her selling style and practices to follow the strategy.  Id.  Cohran recommended that Martínez document the observations one additional time, giving plaintiff an idea of what the potential consequences would be if she was not able to meet expectations within the next thirty (30) days.  Id.

In the Form corresponding to the November 1, 2011 field ride, Martínez recorded that plaintiff "needed improvement" on "Pre-Call Plan", "State Appropriate Patient Type/Need for Second Product", "Customer Interest and Time", and "Post-Call Evaluations". SUMF at ¶ 53.  In the "Summary description of field visit" section of the Form, she stated:

> We needed to review Crestor strategy because based on your pre plan it was not aligned correctly to the initiative discussed during teleconference.  After reviewing it I saw a more effective alignment towards it. However the implementation was not as smooth since customers like Dr. Rodriguez could not identify the appropriate patient for Crestor.  Same happened with Dr. Rios, her non-verbal cues were for you to move faster to your presentation.  We discussed several performance issues during field day. Id.

---

[9] Plaintiff admits this e-mail was sent to Cohran. However, she challenges the truth of the matter asserted by claiming that (i) Martinez "manipulated and fabricated" these negative remarks to adversely affect plaintiff's employment's status on account of her disability (Docket No. 101, "Plaintiff's Responses to Defendants Statement of Facts" at ¶ 50); and (ii) before that date, Martinez never notified Cohran of any concerns about plaintiff's performance or to communicate any problem with plaintiff. Id.

As "action steps," Martínez identified, "Preplan with strategies W/ alignment in mind. Better assessment of customer habits, territory evaluation. Leverage on the ood [sic] cacces [sic] that you have, document all interactions is key to improve metrics." Id.[10]

On November 3, 2011, Martínez sent an e-mail to plaintiff following up on their performance discussion of November 1, 2011. SUMF at ¶ 54.[11]   The e-mail lists specific performance shortcomings observed during the November 1, 2011 field ride, identifying areas in which plaintiff needed to improve within the next thirty (30) days. Id.  Plaintiff was warned that failure to improve her performance within the time provided would result in the issuance of a formal Action Plan. Id.

On November 8, 2011, Saavedra went on a field ride with plaintiff, subsequently sending her an email, with a recap of her observations on plaintiff's performance.  Saavedra recorded some areas as to which she understood plaintiff needed to improve, such as being more relaxed when she was presenting Brilinta inasmuch as she seemed anxious. Id.  She recommended that plaintiff better organize her bag so she had better access and knowledge of its content. Id.

On November 18, 2011, plaintiff sent Martínez an email stating that the day before, she had a pathology procedure for the thyroid condition, that it was painful, and that she had two (2) biopsies (Docket No. 101, Plaintiff's Statement of Additional Uncontested Material Facts at ¶ 38). In the Form corresponding to the field ride of November 21, 2011, Martínez recorded that plaintiff seemed anxious while giving the Brilinta information to one of the doctors and was not concise, which led to loss of customer focus and confusion.  Exhibit 32.

---

[10] It is unclear from the record what "ood" and "cacces" stand for.

[11] Plaintiff admits she received this email but objects as false Martinez' observations (Docket No. 101, "Plaintiff's Responses to Defendants Statement of Facts" at ¶ 54).  She does not direct the court's attention to any response from her to Martinez' performance remarks.

### D.  The 2011 Annual Performance Evaluation

In the 2011 annual performance evaluation, plaintiff received an overall rating of "partially met expectations," for she "failed to meet expectations in one or more essential areas of responsibility." SUMF ¶ 57.  These areas were listed and explained. Id.  Because Saavedra and Martinez felt that plaintiff had not improved her performance, on December 7, 2011 Saavedra sent Cohran the "Action Plan" that Martínez would be presenting to plaintiff, and which would begin on January 9, 2012.  SUMF ¶ 58.  On December 12, 2011, Martínez sent to plaintiff the "Action Plan" by e-mail, together with an invitation for a call to discuss the Plan.  SUMF ¶ 59.

### E.  Reaction

Plaintiff did not accept the invitation to discuss the Plan.  Id.[12]  The same day she received the invitation, she contacted her psychiatrist, Dr. Jorge Sánchez, who placed her on leave at rest. SUMF ¶ 60.  Plaintiff identified her disability as a "mental disorder," meaning "depression and anxiety." Id.  But she did not disclose it to Martínez or Saavedra. SUMF at ¶ 104.  Instead, she sent an e-mail to Donna Kattler, AstraZeneca's Occupational Health Nurse of AstraZeneca's Corporate Health Services, informing her of the doctor's decision to place her on leave "due to a severe depression this including partial hospitalization." SUMF ¶ 60.  On December 16, 2011, Kattler responded to plaintiff's e-mail (1) informing plaintiff that Betsy Rizzuto would be her "nurse contact;" (2) providing plaintiff the nurse's contact information; and letting plaintiff know that Kattler "will request the [Short Term Disability] paperwork for you."  SUMF ¶ 61.

---

[12] Martinez sent the Action Plan to plaintiff by e-mail, with an invitation to discuss it.  Plaintiff replied that the Action Plan was not addressed to her as it included certain accounts that were not hers.  In response, Martinez apologized for the confusion and sent a revised Action Plan with the correct accounts on December 12, 2011.

### F.  Leave Policies

AstraZeneca has a Short Term Disability Policy providing full or partial income replacement for eligible employees during brief periods of disability (both work-related and non-work related) for up to twenty-six (26) weeks (Docket No. 96, Exh. 4).

Payments prior to the conclusion of the twenty-six (26) weeks may be terminated if (i) the eligible employee is no longer disabled, as set forth in the policy; (ii) the employee fails to submit evidence of disability or such other documents as the Corporate Health Services case manager requests or the Administrator deems necessary to administer the STD Policy; and (iii) the employee fails to respond to requests from Corporate Health Services within three (3) business days of the requests and within normal business hours. Id.

If STD benefits are suspended or denied and the employee does not return to work, the employee may be considered to have abandoned the job and be subject to immediate termination from employment. Id.

### G.  Paperwork

On December 20, 2011, Vickie Lenhard, Human Resources' Service Center Advisor, sent plaintiff the STD and FMLA paperwork so that she could apply for leave. SUMF ¶ 62.  The same day, Lenhard sent plaintiff a "Notice of Eligibility and Rights and Responsibilities for Leave under the Family Medical Leave Act and/or AstraZeneca's FMLA Policy." Id.  The documents contained the instructions and information plaintiff needed to apply for both FMLA and STD leave.  SUMF ¶ 63.

Taymari Delgado-Echevarria v. AstraZeneca, LLP, *et al.*
Civil No. 13-1160 (PAD)
Opinion and Order
Page 12

## H.  Plaintiff's Response to Action Plan

On December 23, 2011, plaintiff sent an email to Martínez, Saavedra, David Hennessy, Debbie Coen and Cohran with the subject "Response for Email on 10/21/11," attaching a letter dated December 12, 2011. SUMF at ¶ 64.   In the letter, she complained about Martínez' observations as to her performance and the announced Action Plan. Id.  She asserted that she did not want to "believe that is for my age or for my race or because my high salary or even do [sic] for my recent health condition that was diagnosed on [sic] October. I never felt so discriminated. If AZ wants a younger employee with less salary the least I can receive for my years of service is been [sic] dismiss [sic] with honesty" (Docket No. 96, Exh. 38 at page bates stamped as 188).

Cohran decided to discuss the letter with plaintiff once she returned to work from leave. SUMF at ¶ 65. Because plaintiff never returned to work, he never did so.  He had a telephone call on January 9, 2012 with Martínez and Saavedra to interview them in connection with plaintiff's allegations.  Id.  On January 17, 2012, plaintiff was (1) approved STD benefits retroactive to December 12, 2011, and until January 22, 2012; (2) informed that she would be concurrently approved leave under FMLA for the same period; and (3) made aware that the FMLA leave of absence ran concurrently with the STD leave. SUMF at ¶ 77. Once plaintiff's SDT benefits were approved, at various points they were extended until February 12, 2012; until March 4, 2012; and until March 11, 2012, with March 12, 2012 as the return-to-work date. SUMF at ¶¶ 79-81.

## I.  Documentation

On March 8, 2012, doctor Sánchez sent AstraZeneca a fax with his medical notes regarding plaintiff's February 22, and March 8, 2012's medical evaluations with "AstraZeneca's Physician Statement of Medical Condition" form describing plaintiff as "mildly ill."  Upon reviewing these documents, Rizzuto concluded they did not support continued disability status.  On March 8, 2012,

she left a voicemail message to plaintiff informing her that she could not support her medical leave beyond that week (e.g. the week of March 11, 2012). SUMF at ¶ 81.[13]  On March 13, 2012, plaintiff was notified by Vickie Lenhard via e-mail that her STD benefits terminated due to lack of support. A letter dated March 12, 2012 with additional clarification was attached. SUMF at ¶ 82; see also, Docket No. 96, Exh. 46A.

On March 14, 2012, plaintiff sent a fax to Rizzuto enclosing a copy of an "assistance certification" (Certificación de Asistencia) issued by psychologist Giselle M. Suárez, confirming an appointment plaintiff had with her on March 13, 2012. SUMF at ¶ 83.  The certification did not contain any indication that plaintiff needed a leave extension.  Id.

On March 19, 2012, Cohran sent her a letter by Federal Express stating that (1) her STD benefits terminated as of March 11, 2012; (2) her FMLA leave expired as of March 4, 2012; and (3) she was expected to return to work on March 22, 2012, or it would be presumed that she had resigned from employment. SUMF at ¶ 84.  That day, doctor Sánchez sent a letter to AstraZeneca recommending an extension of the leave until March 30, 2012.  SUMF at ¶ 85.  The letter stated that plaintiff "has improved as was expected," and her medications are being reevaluated and started to "taper down."  Id.

### J.  Reorganization

On December 2, 2011, AstraZeneca announced that it would reduce its US field sales organization by approximately 24%. SUMF at ¶ 67.  The reorganization was expected to impact

---

[13] In response to SUMF ¶ 81, plaintiff states that in his February 22, 2012's note, doctor Sánchez wrote "that plaintiff should stay out of her work" (Docket No. 101 at ¶ 81).  Plaintiff's representation is incorrect.  The doctor wrote that she "continues off from work. Doctor Falcón gave her a certificate until March" (In Spanish, "se mantiene fuera del trabajo. Dra. Falcón le dio certificado hasta marzo.")  See, Docket No. 98, Exh. 46 at page bates-stamped AZ 0001881 and Docket No. 115-6, including the certified translation of the progress note.  Assessing plaintiff's condition on February 22, 2012, he wrote that plaintiff was "Mildly ill" and "very much improved."  Id. at p. AZ 0001882. The same assessment appears on his progress note of March 8, 2012. Id. at p. AZ 0001884.

1,150 leadership and sales representative positions, varying by team and geography. Id.  Pricing pressures, the ongoing growth of generic medicine, changes in how customers wanted to interact with the Company and anticipated revenue declines due to upcoming expiration of patents of several leading brands were some of the factors that led to this decision. Id.

To identify which employees would be displaced as a result of the reorganization, AstraZeneca contracted the services of a third party vendor, Cognizant Technology Solutions Corporation.  SUMF at ¶ 68.  The selection process performed by Cognizant took into consideration AstraZeneca's business rules for sales restructuring, based on the future needs of the organization; employees' individual capabilities, experience and performance, skill assessment score, career ladder, tenure, previous and current year rating, and percentage overlap between current and future territories. Id.

Saavedra provided input as to the restructuring of the Puerto Rico sales force. SUMF at ¶ 69.  Following AstraZeneca's US guidelines, she recommended that plaintiff's territory and position be eliminated.  SUMF at ¶¶ 70-71.  Plaintiff had been assigned to the Hospital Team, in the Hospital East Territory.  The territory was created with the expectation that there would be at least one hospital with angioplasty service for the primary product, Brilinta, but that never happened. Id.  Saavedra recommended the elimination of the territory and position due to the lack of any such hospital or unit within the territory; plaintiff's evaluation rating; and plaintiff's placement on an Action Plan.  SUMF at ¶¶ 70-73.  Cognizant independently identified plaintiff as an employee to be displaced, for her territory was to be eliminated; plaintiff's performance in 2011 rating did not meet expectations; and plaintiff had been placed on an Action Plan. SUMF at ¶ 74.

In the meantime, on January 17, 2012, plaintiff had been approved STD benefits retroactive to December 12, 2011; and until January 22, 2012. SUMF at ¶ 77.  Given that (1) plaintiff's

territory and position were eliminated due to the reorganization; and (2) plaintiff had been out on leave since December 12, 2011; was not expected to return to work until January 23, 2012; and AstraZeneca did not know if and when she would return to work, it was decided that, should she return to work prior to January 30, 2012, she would be offered a severance package.  SUMF at ¶ 78.  However, if she did not return to work, the company would create a "floating position" for her. Id.  Because plaintiff had not returned to work by January 30, the position was so created.  SUMF at ¶ 80.  It was a place-holder, without a territory or customers, for plaintiff to be eligible to receive pay and benefits while on short-term disability leave.

### K.  Cohran's call to plaintiff

By March 22, 2012, plaintiff had not returned to work.  SUMF at ¶ 86.  Cohran contacted her to see when she would return to work, and to discuss available options. Id.  At that time, there was a second reorganization impacting the Cardiovascular Specialty Care division, the division to which plaintiff's "floating position" belonged.  With the second reorganization, positions occupied by individuals on formal performance management such as Action Plans would be eliminated, and the employees offered a severance package.  Because plaintiff's floating position would be eliminated as part of the reorganization, Cohran offered her the package and informed her that she could submit by March 30, 2012, any additional medical documentation that she felt she needed to give Rizzuto to support continuation of STD leave. SUMF at ¶ 87.

On March 29, 2012, plaintiff submitted by fax a letter from doctor Sánchez stating that she had severe depression and anxiety, and was in no condition to return to work.  SUMF at ¶ 90.  On March 30, 2012, AstraZeneca's occupational health physician, Dr. Joseph Henry, sent a written communication to doctor Sánchez acknowledging receipt of the fax. SUMF at ¶ 91.  He inquired as to the merits of plaintiff's request for extension of her leave as well as the reason for plaintiff's

relapse, given that from prior information provided by doctor Sánchez himself, plaintiff was only "mildly ill." The same day, doctor Sánchez responded to doctor Henry's requests, indicating that the only identified stressor was return to work.  Id.

### L.  Additional extension of the STD's benefits

Based on the information doctor Sánchez provided, on March 30, 2012 plaintiff's STD leave was extended until April 29, 2012. SUMF at ¶ 92.  On April 3, 2012, plaintiff was specifically advised by Rizzuto that if she was not released to work on April 30, 2012, she would need to submit additional supporting documentation justifying an extension of her STD leave. SUMF at ¶ 93.[14]  As of May 7, 2012, however, plaintiff had not done so.  SUMF at ¶ 94.  On May 8, 2012, Vickie Lenhard and Cheryl Snuffer (HR Service Center Advisors) sent her an email attaching a letter dated May 7, 2012, stating that her STD benefits had been terminated effective April 30, 2012, and if she disagreed with the decision, she could file an appeal with the Administrator of the STD policy.  Plaintiff did not appeal the decision.  Id.

On May 14, 2012, Cohran sent a letter to plaintiff restating that (1) her FMLA benefits were exhausted as of March 4, 2012; (2) her STD benefits had ended on April 30, 2012; and (3) she had not returned to work nor contacted her DSM. SUMF at ¶ 96.  She was advised that, if she did not return to work by May 17, 2012, she would be presumed to have resigned from employment and removed from the payroll.  Id.  Plaintiff never returned to work.  If plaintiff had reported back to work, the Company would have determined what position plaintiff would be assigned to (Docket No. 96, Exh. 14 at p. 185.

---

[14] Plaintiff denies this statement contending she was not required to submit any type of document and that she was not advised that the benefits would be terminated on April 30, 2012 (Docket No. 101 at ¶ 94). Troubling, however, plaintiff admits that she received Rizzuto's email explaining that additional documentation was needed if she was not released to work on April 30, 2012. Id. at ¶ 93. As such, this statement is deemed admitted.

Taymari Delgado-Echevarria v. AstraZeneca, LLP, *et al.*
Civil No. 13-1160 (PAD)
Opinion and Order
Page 17

## M. Request for a 12-month extension

On May 17, 2012, doctor Sánchez sent to AstraZeneca a document stating that plaintiff was unable to work for the following twelve (12) months. SUMF at ¶ 97.  According to the document, doctor Sánchez understood that the probable duration of plaintiff's condition would be "more than one year." He stated that the estimate counted from May 14, 2012. Id.  When estimating the beginning and ending dates for the period of incapacity, he added "12 months."  Upon reviewing the document, Rizzuto emailed Cohran that, based on the information provided she could not support reinstating plaintiff's STD benefits.  SUMF at ¶ 98.  Rizzuto also informed Cohran that she had left a voicemail to plaintiff so confirming. Id.

On May 18, 2012, Cohran sent plaintiff a letter indicating that, pursuant to his May 14th letter, plaintiff's failure to return to work on May 17th was presumed a resignation which was accepted by the company.  However, in light of the more recent reorganization, the Company was extending to her a non-negotiable severance offer that included a two (2) month pay continuation until termination, to be effective on July 19, 2012. SUMF at ¶¶ 99-100.

On July 17, 2012, Cohran sent plaintiff a letter stating that as outlined in the May 18th letter, due to a recent reorganization her position was eliminated; she was made a severance offer that included two (2) months of pay continuance; and that termination would be effective as of July 19, 2012 (Docket No. 105, Exh. 68).  The letter described that content of the severance package offered in the May 18th letter, and provided plaintiff with a specific term to sign and return the documents. Id.

## IV.       DISCUSSION

### A.  Disability discrimination

Plaintiff alleges to have been discriminated against because of disability in violation of the ADA and Law 44 (Docket No. 1 at p. 10).[15]  Her claim may be divided in two (2) stages: discrimination *before* her leave of absence; and discrimination *after* she began the leave of absence.

#### 1.  Pre-Leave Discrimination

Plaintiff contends that after she disclosed her medical condition and need for treatment to Martínez in October 2011, Martinez criticized her work performance, began to screen her daily visits, and placed her in an action plan (Docket No. 114 at pp. 3, 6); see also, Docket No. 129 at pp. 5-6.  The ADA prohibits employers from discriminating against a qualified individual with a disability because of the disability.  42 U.S.C. § 12112(a).  Plaintiff's disability consists of depression and anxiety (Docket No. 114 at p. 3).  But she never disclosed those conditions to Martinez.

A plaintiff cannot veritably claim to have been discriminated against because of disability by individuals who had no knowledge of the asserted disability.  See, Howard v. Steris Corp., 550 Fed.Appx. 748, 751 (11th Cir. 2013)(explaining that employer cannot discriminate because of the employee's disability under the ADA unless it has knowledge of the alleged disability at the time

---

[15] Law No. 44 is the Puerto Rico analogue to the ADA.  González v. El Día, Inc., 304 F.3d 63, 74 n.8 (1st Cir. 2002); Salgado-Candelario v. Ericsson Caribbean, 614 F.Supp.2d 151, 175 (D.P.R. 2008).  It was modeled after the ADA, to harmonize Puerto Rico law with the federal statute.  Arce v. ARAMARK Corp., 239 F.Supp.2d 153, 168-169 (D.P.R. 2003); Franco v. GlaxoSmithKline, 2009 WL 702221, *31 n. 17 (D.P.R. March 11, 2009).  Thus, the elements of proof for a claim under Law No. 44 are essentially the same as for a claim under the ADA. Zayas v. Commonwealth of Puerto Rico, 378 F.Supp.2d 13, 23-24(D.P.R. 2005); Torres-Oliveras v. Special Care Pharmacy Services, 2011 WL 2199354, *9 (D.P.R. June 6, 2011).  Since in that sense the statutes are coterminous, Ruiz-Rivera v. Pfizer Pharmaceuticals, LLC, 521 F.3d 76, 87 (1st Cir. 2008); Acevedo López v. Police Dept. of Com. of Puerto Rico, 247 F.3d 26, 29 (1st Cir. 2001), the disability discrimination claims will be analyzed under the ADA.

it takes an adverse action); <u>Nilles</u> v. <u>Givaudan Flavors Corp.</u>, 521 Fed.Appx. 364, 368-369 (6th Cir. 2013)(summary judgment dismissing ADA claim, since decision-maker had no knowledge of plaintiff's disability); <u>Taylor</u> v. <u>Principal Financial Group, Inc.</u>, 93 F.3d 155, 165 (5th Cir.), *cert. denied,* 519 U.S. 1029 (1996)("To prove discrimination, an employee must show that the employer knew of such employee's substantial physical or mental limitation(s)"); <u>Hedberg</u> v. <u>Indiana Bell Telephone Co., Inc.</u>, 47 F.3d 928, 932 (7th Cir. 1995)("We think that an employer cannot be liable under the ADA for firing an employee when it indisputably had no knowledge of the disability. [. . .] At the most basic level, it is intuitively clear when viewing the ADA's language in a straightforward manner that an employer cannot fire an employee 'because of' a disability unless it knows of the disability.").

Plaintiff points out that she suffers from a pituitary adenoma and thyroid nodules, and that she so informed Martinez in October 2011, hence implying that Martínez acted against her because of those conditions (Docket No. 114 at pp. 4-7). The complaint states that (1) plaintiff was a qualified individual with mental impairments of major depression and anxiety; (2) those impairments substantially limited her ability to sleep, concentrate and work (among others); and (3) the impairments constitute a disability within the meaning of ADA (Docket No. 1 at ¶¶ 70-72). It is silent as to pituitary adenoma or thyroid nodules as impairments configuring a disability.

When plaintiff was asked during her deposition what disability she was basing her claim on she did not mention pituitary adenoma or thyroid nodules.[16]   She cannot now change her

---

[16] Plaintiff testified as follows:
> **Q**. …. When you say "disability," what medical condition is the basis of your complaint.
> **A**. The medical condition is a condition of medical disorder.
> **Q**. And when you say "mental disorder," do you mean anxiety and depression, as we have discussed before?
> **A**. Depression. Yes, depression and anxiety.

<u>See</u>, SUMF at ¶ 103.

litigation posture invoking as a disability something different than what she originally alleged and admitted.  See, Morales v. AC Orssleff's EFTF, 246 F.3d 32, 35 (1st Cir. 2001)(in the context of contradictory affidavits, holding that when an interested witness has given clear answers to unambiguous questions in a deposition she cannot create a conflict and resist summary judgment presenting a contradictory version without a satisfactory explanation of why the version has changed); Torres v. E.I. Dupont de Nemours & Co., 219 F.3d 13, 20 (1st Cir. 2000)(same).

Even assuming plaintiff's claim of disability is also based on conditions other than depression or anxiety, the record does not sustain her theory.  Merely pointing to a diagnosis is inadequate.  Calef v. Gillette Co., 322 F.3d 75, 86 (1st Cir. 2003).  Knowing that an employee has health problems is not the same as knowing that the employee suffers from a disability.  Nilles v. Givaudan Flavors Corp. 521 Fed.Appx. 364, 369 (6th Cir. 2013)(quoting Brown v. BKW Drywall Supply, Inc., 305 F.Supp.2d 814, 829 (S.D. Ohio 2004)).

Nor is there evidence that would suggest those conditions substantially limited plaintiff's major life activities to qualify as a disability under the ADA.  The determination of whether an individual has a disability is not necessarily based on the impairment the person has, but rather on the effect that impairment has on the life of the individual.  González, 304 F.3d at 74; Castro-Medina v. The Procter & Gamble Commercial Co., 565 F.Supp.2d 343, 362 (D.P.R. 2008).  Accordingly, it is incumbent upon the ADA plaintiff to assert not only a disability, but also any limitation resulting therefrom.  Taylor, 93 F.3d at 164.

Plaintiff has not alleged that pituitary adenoma or thyroid nodules had any real effect on any of her major life activities.  In fact, her endocrinologist testified during her deposition that both conditions are benign, and that the only way they affected plaintiff was in causing "galactorrea" (production of breast milk) but otherwise did not affect plaintiff's ability to work,

sleep or read (Docket No. 96, Exh. 58).  With that in mind, they do not qualify as a disabilities under the ADA.  See, Rodriguez v. Sistema San Juan Capestrano, 939 F.Supp.2d 94, 100-101 (D.P.R. 2013)(summary judgment dismissing complaint of plaintiff who failed to show that thyroid condition was a disability under ADA); Branscomb v. Group USA, Inc., 475 Fed.Appx. 134, 136 (9th Cir. 2012)(dismissing ADA claim of plaintiff who failed to produce evidence that the disability asserted – pituitary tumor – limited a major life activity to the point of being considered a disability).

Plaintiff argues that because of the thyroid and pituitary diagnoses she informed Martínez of, AstraZeneca regarded her as disabled, perceiving her as substantially limited in her ability to work, and as such, discriminated against her in violation of the ADA (Docket No. 114 at p. 8). Under the definition of disability, an individual may be considered disabled if she is regarded as having a physical or mental impairment which substantially limits one or more life activities.  Ruiz-Rivera v. Pfizer Pharmaceuticals, LLC, 521 F.3d 76, 82 (1st Cir. 2008); Quiles-Quiles v. Henderson, 439 F.3d 1, 5 (1st Cir. 2006).  The purpose of protecting those who are regarded as disabled from discrimination is to prohibit employers from relying on stereotypic assumptions not truly indicative of individual ability.  Quiles-Quiles, 439 F.3d at 6 (quoting Sutton v. United Airlines, 527 U.S. 471, 489 (1999)).

There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has an impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more life activities.  Sullivan v. The Neiman Marcus Group, Inc., 358 F.3d 110, 117 (1st Cir. 2004)(citing Sutton, 527 U.S. at 489)).  To raise an actionable "regarded as" claim, plaintiff must identify in the complaint the major life activity

she will attempt to prove the employer regarded as being substantially limited by her impairment.

Ruiz Rivera, 521 F.3d at 85.

Given that the complaint contains no "regarded as" claim, no colorable "regarded as" action has been properly raised.  Id. (rejecting "regarded as" claim, for "[i]t simply will not do for a plaintiff to fail to plead with adequate specificity facts to support a regarded as claim, all-the-while hoping to play that card if her initial hand is a dud.").   Summary judgment "is not a procedural second chance to flesh out inadequate pleadings."   Id. (quoting Fleming v. Lind-Waldock & Co., 922 F.2d 20, 24 (1st Cir. 1990)).

Accepting, for purposes of argument, that plaintiff's reference to the activity of working in the opposition to summary judgment is enough to properly bring forth a "regarded as" claim as to that activity, she cannot avoid dismissal.  When working has been invoked as the major life activity in a "regarded as" claim, plaintiff must demonstrate, not only that the employer thought she was impaired in her ability to do her job, but that the employer regarded her as significantly impaired in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.  Ruiz-Rivera, 521 F.3d at 83.  Yet no such evidence was presented here.  See, Sheehan v. City of Gloucester, 321 F.3d 21, 25-26 (1st Cir. 2003)(summary judgment dismissing "regarded as" claim in absence of evidence that employer regarded plaintiff's condition – hypertension – as rendering him unable to perform a broad range of jobs).

Moreover, to establish a "regarded as" claim, plaintiff must go beyond simply showing that the employer knew of the employee's medical condition or that the employee had sought medical treatment.  Olson v. Dubuque Community School Dist., 137 F.3d 609, 612 (8th Cir. 1998).  Medical problems in and of themselves do not signal the existence of a disability.  Gorbitz v.

Corvilla, Inc., 196 F.3d 879, 882 (7th Cir. 1999).  There is no evidence that Martínez, Saavedra or

any decision-maker in AstraZeneca believed that plaintiff's health condition was substantially

impairing a major life activity before plaintiff informed the Occupational Health Nurse on

December 12, 2011, of her physician's decision to place her on leave due to severe depression.

Finally, to prevail on a discrimination claim under the ADA plaintiff must demonstrate an

adverse employment action.  Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc., 447 F.3d

105, 111 (1st Cir. 2006); Morales-Vallellanes v. Potter, 605 F.3d 27, 36 (1st Cir. 2010); Povey v.

City of Jeffersonville, Ind., 697 F.3d 619, 622 (7th Cir. 2012).  An adverse action is one that is

materially adverse in that it carries tangible consequences.  At bottom, it involves – or is relied on

to support – a material change in terms and conditions of employment such as termination,

suspension, failure to promote, demotion, or materially disadvantageous transfers or reductions in

compensation.  Blizzard v. Marion Technical College, 698 F.3d 275, 290 (6th Cir. 2012); Lucas

v. W.W. Grainger, Inc., 257 F.3d 1249, 1261 (11th Cir. 2001).

Whether it does so is gauged by an objective standard.  Morales-Vallellanes, 605 F.3d at

35 (citing Blackie v. Maine, 75 F.3d 716, 725 (1st Cir 1996)).  An employee's displeasure at an

action, standing alone, does not render it materially adverse.  Gómez-Pérez v. Potter, 452

Fed.Appx. 3, 8 (1st Cir. 2011); Givens v. Cingular Wireless, 396 F.3d 998 (8th Cir. 2005).  Plaintiff

takes issue with criticism, the level of scrutiny, the evaluation, and the Action Plan (Docket No.

114 at pp. 3-4, 6-7).

Employer criticism is an ordinary and appropriate feature of the workplace.  Davis v. Town

of Lake Park, Fla., 245 F.3d 1232, 1242 (11th Cir. 2001).  It can prompt an employee to improve

her performance, and thus lead to a more constructive employment relationship.  Oest v. Illinois

Dept. of Corrections, 240 F.3d 605, 613 (7th Cir. 2001)(so asserting).  On that basis, counseling,

reprimands and warnings are a proper instrument for management to focus employees' attention on the need to correct some workplace behavior that the employer perceives as needing correction. Performance improvement plans serve much the same purpose, with a sense of added importance for the employee to overcome the problems the employer has identified.  In turn, evaluations provide feedback to employees on overall performance and/or different aspects of their job.

None of those actions here encompassed or resulted in material changes in the terms and conditions of plaintiff's employment.  As such, they are not materially adverse.  See, Bhatti v. Trustees of Boston University, 659 F.3d 64, 73 (1st Cir. 2011)(critical memoranda and reprimands without tangible consequences not considered materially adverse); Newton v. Office of the Architect of the Capitol, 905 F.Supp.2d 88, 94 (D.D.C. 2012)(job-related criticism in itself not materially adverse); Hicks v. Rubin, 6 Fed.Appx. 70, 73 (2d Cir. 2001)(negative performance reviews do not rise to level of materially adverse employment action); Davis, 245 F.3d at 1241 (counseling and low or negative performance ratings and evaluations, standing alone, do not constitute an adverse employment action)(collecting cases); Oest, 240 F.3d at 613 (reprimands and unfavorable performance evaluations alone do not constitute adverse employment actions).[17]

Along the same line, neither extreme supervision and snubbing, nor increased criticism satisfy the adverse action prong.  Gómez-Pérez, 452 Fed.Appx. at 8.  They do not do so even if combined with an increased workload.  See, Hicks, 6 Fed.Appx. at 72 (constant monitoring and workload reviews do not constitute materially adverse employment actions); Marrero v. Goya of

---

[17] To be sure, the employer considered plaintiff's performance – reflected in the field ride forms, the evaluations, and the action plan – in its decision to eliminate, during the first reorganization and the second reorganization, the positions that plaintiff held. But those reorganizations did not result in tangible consequences for plaintiff.  There is no evidence that she received anything less than the same compensation and benefits she had received prior to the reorganizations.  Her employment terminated when she did not report back to work after the leave of absence expired.

Puerto Rico, Inc., 304 F.3d 7, 23-25 (1st Cir. 2002)(the fact that plaintiff was required to do more work under extreme supervision did not rise to level of an adverse employment action).

That plaintiff may have been advised of a potential termination if she did not improve her performance is unavailing.  Pre-disciplinary personnel actions do not rise to the level of material activity required to sustain a discrimination claim.  Gómez-Pérez, 452 Fed.Appx. at 8.  The ADA does not bar dialogue on problems such as substandard job performance.  Tyndall v. National Educ. Centers, Inc. of California, 31 F.3d 209, 215 (4th Cir. 1994).  Even the possibility of dismissal mentioned in an action plan is not materially adverse, for it is contingent on future developments rather than being a present plan or decision.  Agnew v. BASF Corp., 286 F.3d 307, 310 (6th Cir. 2002).

What is more, successive disciplinary measures carrying an employee closer to dismissal are not deemed adverse in themselves.  See, Barnett v. Athens Regional Medical Center, Inc., 550 Fed.Appx. 711, 713 (11th Cir. 2013)(although written reprimands were steps in the employer's progressive disciplinary policy which could have led to harsher disciplinary actions, they were not actionable because the record did not show that they had any tangible effects on plaintiff's employment); Rennard v. Woodworker's Supply, Inc., 101 Fed.Appx. 296, 307-308 (10th Cir. 2004)(reprimands received by employee pursuant to employer's progressive disciplinary process not considered adverse actions notwithstanding that each reprimand brought employee closer to termination, absent evidence of sufficiently tangible job consequences linked to the reprimands).

At the end of the day, what plaintiff complains of does not measure up to established liability standards.  If those personnel actions were to be considered materially adverse, they would fall short of supporting her theory.  A relevant factor in the assessment is the point in time where the problems they refer to appeared, and whether they persist.  Under those conditions, they are

not – without more – indicative of prohibited discrimination.  See, Kosereis v. Rhode Island, 331 F.3d 207, 217 (1st Cir. 2003)(summary judgment rejecting discrimination/retaliation claim in part because plaintiff had been disciplined for the same problem before and after the alleged discrimination took place); Cyprow v. Texas Dept. of Public Safety, 2009 WL 1743826, *26 (S.D. Texas June 17, 2009)(summary judgment dismissing discrimination and retaliation claims of employee whose performance problems were the same before and after her discrimination complaint); Sheridan v. New York Life Inv. Management, LLC, 2012 WL 474035, *7 (S.D.N.Y. February 9, 2012)(summary judgment dismissing discrimination complaint of plaintiff with history of performance concerns that predated appointment of supervisor who decided to terminate her employment).  The problems in this case are not exclusive of the period following plaintiff's informing Martínez of her medical condition.[18]

Plaintiff maintains that her prior performance was excellent, and only with Martínez it ended up being criticized after she notified her of the diagnosis (Docket No. 114 at pp. 3-4, 6). For all that, past satisfactory reviews do not call into question subsequent criticism even when they culminate in a discharge.  Leffell v. Valley Financial Services, 113 F.3d 787, 795 (7th Cir. 1997). Likewise, prior evaluations fail to render more recent negative evaluations inherently untrustworthy.  Kerns v. Capita Graphics, 178 F.3d 1011, 1018 (8th Cir. 1999)(citing Rose-Maston

---

[18] In several field rides that took place *before* plaintiff notified her diagnosis in October of 2010, she was given similar observations directed toward the need to take steps to improve her development and performance. For example, the Form on the Field ride conducted on April 12, 2010 noted several deficiencies and problems in four out of five areas evaluated.  The observations noted the need for plaintiff to "focus should be to the top customers to the specific objective and the simplicity of the conversation so the features and benefits of our portfolio begins to be the solution for the customers."  Martínez also stated that plaintiff had to "plan for the objective to be clear and simple, follow up on the rearrangement of routing so you impact those top customers with the right reach and frequency, important to allocate the resources since the beginning of the month so you are giving the tops the most [sic] of the resource [sic]" (Docket No. 96, Exh. 16).  In May 2010, also before the notice of her diagnosis, she was reminded of the need to be clear, simple and focus on the top customers' needs "so the features and benefits of our portfolio begins to be the solution for the customers" Id. Similar observations were made *after* she notified her diagnosis.  To that end, in the Form pertaining to April 28, 2011, plaintiff was reminded of the need to be more specific, focus on the specific patient type and bring the solution. Additionally, Martínez highlighted the need for plaintiff to have a specific objective and deliver it in a concise manner. Id. Exh. 26. This observation was also noted in the Forms corresponding to May 23, 2011 (Exh. 17), June 13, 2011 (Exh. 18), August 18, 2011 (Exh. 20), and others.

v. NME Hosps., Inc., 133 F.3d 1104, 1109 (8th Cir. 1998).  In themselves, they are insufficient to

sustain a viable discrimination claim.[19]

### 2.   Post-leave discrimination

Plaintiff complains that AstraZeneca failed to provide her with reasonable accommodation

in May 2012 by terminating her employment rather than extending the leave of absence for twelve

(12) additional months (Docket No. 114 at p. 11).  Discrimination includes failure to provide

reasonable accommodation unless doing so imposes undue hardship on the employer.  42 U.S.C.

§ 12112(b)(5)(A); Colón-Fontánez v. Municipality, 660 F.3d 17, 32 (1st Cir. 2011); McCarroll v.

Somerby of Mobile, LLC, 595 Fed.Appx. 897, 899 (11th Cir. 2014).

The court will assume that depression with anxiety falls within the meaning of disability.

But to invoke the ADA's antidiscrimination provision, plaintiff must be qualified, that is, able to

perform the essential functions of the position with or without reasonable accommodation.  42

U.S.C. § 12111(8); Ríos-Jiménez v. Principi, 520 F.3d 31, 41 (1st Cir. 2008); Feliciano v. State of

R.I., 160 F.3d 780, 786 (1st Cir. 1998); Colón-Fontánez, 660 F.3d at 32.

Plaintiff was not a qualified individual with a disability as of May 17, 2012.  The record

shows she provided AstraZeneca medical certificates from doctor Sánchez recommending that she

stay at rest and requested STD benefits to rest as recommended by her doctor.  After various leave

---

[19] This conclusion is not altered by plaintiff's contention that she was performing satisfactorily in many areas and that she even received "recognitions and awards for her effective performance." See, Docket No. 101 at ¶¶ 1-31.  The reason is simple: plaintiff's evidence of good performance ratings and awards is insufficient to rebut AstraZeneca's evidence of dissatisfaction with her performance in other areas. "[A]n employee generally could be performing satisfactorily in some areas of the job, yet be deficient in others," but that does not deprive an employer of the right to terminate employees with performance deficiencies. See, Menzel v. Western Auto Supply Company, 662 F.Supp. 731, 743 (D.P.R. 1987), aff'd, 848 F.2d 327 (1st Cir. 1988)(citing, Oglesby v. Coca Cola Bottling Co., 620 F.Supp.1336, 1347 (D.Ill. 1985) where an employee did not meet employer's legitimate expectations even though he could have been excelling in sales volume, but was deficient in other areas)); Merrick v. Northern Natural Gas Co., 911 F.2d 426 (10th Cir. 1990)(generally good evaluations did not rebut employer's view that plaintiff had been insubordinate to his immediate supervisor and had poor communication skills); Kittredge v. Parker Hannifin Corp., 597 F.Supp. 605, 610 (D.C.Mich. 1984)(that employee generally received overall satisfactory rating on an evaluation preceding termination is not inconsistent with evidence of undesirable flaws in employee's performance).

extensions, her doctor stated that she was "in no condition to return to work," and that "the only

identified stressor was the return to work" (Docket No. 96, Exh. 52).

It is hard to conclude that plaintiff was able to perform her duties with or without reasonable

accommodation in May 2012 if the act of returning to work itself was "the only identified stressor"

for her disability.  See, Mole v. Buckhorn Rubber Products, Inc., 165 F.3d 1212, 1217 (8th Cir.

1999)(plaintiff whose work had deteriorated as a result of claimed disability and resulting

depression was not otherwise qualified); Coleman v. Computer Associates Intern., Inc., 1998 WL

54681  (9th Cir. February 6, 1998)(plaintiff unable to return to work even after a leave of absence

because of stress associated with the job); Marino v. U.S. Postal Service, 1994 WL 224161, *3

(1st Cir. May 27, 1994)(plaintiff could not work in stress-producing environment); Allen v. GTE

Mobile Communications Service Corp., 1997 WL 148670, * 2 (N.D. Ga. Feb. 26, 1997)(plaintiff

could not return to work because the workplace itself contributed to emotional problems causing

her disability).  On this record, plaintiff's challenge cannot stand.  See, Ríos-Jiménez, 520 F.3d at

42-43 (summary judgment dismissing ADA claim of employee who could not establish that she

was able to perform the essential functions of her job); Colón-Fontánez, 660 F.3d at 32 (same).

At the same time, if plaintiff were considered a qualified individual with a disability, her failure to

accommodate claim would fail.

The leave extension request was made after the employer decided to terminate the

employment relationship and informed plaintiff of its decision.  When an employee requests an

accommodation after it becomes clear that an adverse employment action is imminent, such a

request can be "too little, too late."  See, Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 90 (1st

Cir. 2012)(summary judgment dismissing failure to accommodate claim of plaintiff who requested

accommodation after knowing he would be terminated for failure to perform an essential function

Taymari Delgado-Echevarria v. AstraZeneca, LLP, *et al.*
Civil No. 13-1160 (PAD)
Opinion and Order
Page 29

of the job); Amadio v. Ford Motor Co., 238 F.3d 919, 923, 929 (7th Cir. 2001)(summary judgment

dismissing ADA claim of employee expected to return to work on or before March 7th; given that

he did not do so, decision was made to terminate his employment on March 8th; the employee

unsuccessfully attempted to return to work on March 9th with a note including an expected return-

to-work date of March 17th.   However, the accommodation request was not made prior to

supervisor's decision to terminate the employment); McCarroll, 595 Fed.Appx. at 899 (summary

judgment dismissing failure to accommodate claim of plaintiff who failed to make demand for

accommodation before his superiors decided to fire him); Blazek v. City of Lakewood, Ohio, 576

Fed.Appx. 512, 517-518 (6th Cir. 2014)(summary judgment dismissing failure to accommodate

claim of plaintiff who failed to request the accommodation prior to termination); Green v. Medco

Health Solutions of Texas, LLC, 947 F.Supp.2d 712, 728-729 (N.D. Texas 2013)(summary

judgment dismissing failure to accommodate claim where accommodation request was made after

termination decision was made but before it was processed); Cash v. Siegal-Robert, Inc., 2012 WL

3683466, *15 (W.D. Tenn. August 24, 2012)(employee terminated upon expiration of leave on

September 18th; system did not process the termination until September 23rd; and termination

notice did not issue until September 30th; employee's September 21st return from leave considered

untimely).

    Not only did the leave extension request come in late, but it did not provide the employer

with an alternative that could be considered reasonable.  The term "reasonable accommodation"

refers to accommodations which presently, or in the relatively near future, would reasonably

enable the employee to perform the essential functions of the job.  Roddy v. City of Villa Rica,

Ga., 536 Fed.Appx. 995, 1001 (11th Cir. 2013); Hudson v. MCI Telecommunications Corp., 87

F.3d 1167, 1169 (10th Cir. 1996).

An essential function is one that bears more than a marginal relationship to the job at issue. Colón-Fontánez, 660 F.3d at 33.  It is a fundamental job duty. Id.  In line with this principle, attendance has been recognized as an essential function of the job.  See, Willis v. Conopco, Inc., 108 F.3d 282, 287 (11th Cir. 1997)(employee's presence at work on a routine basis is "an essential element of the job"); Colón-Fontánez, 660 F.3d at 33 (attendance is considered an essential job function); Ríos-Jiménez, 520 F.3d at 42 ("At the risk of stating the obvious, attendance is an essential function of any job").

An allowance of leave for medical care or treatment may constitute a legitimate accommodation in appropriate circumstances.  Robert v. Board of County Com'rs of Brown County, Kans., 691 F.3d 1211, 1217-1218 (10th Cir. 2012).  As with any accommodation, it must be reasonable.  And to be reasonable, it must likely enable the employee to return to work in the near future.  See, Watkins v. J&S Oil Co., Inc., 164 F.3d 55, 61-62 (1st Cir. 1998)(summary judgment dismissing ADA claim of employee who could not advise employer with sufficient specificity that in the immediate future he would be able to resume his job); Duckett v. Dunlop Tire Corp., 120 F.3d 1222, 1226 (11th Cir. 1997)(pointing out that "reasonable accommodation is by its terms most logically construed as that which, presently, or in the immediate future, enables the employee to perform the essential functions of the job in question").  The plaintiff bears the burden of showing the availability or existence of an accommodation that can be considered reasonable.  Jones v. Walgreens Co., 679 F.3d 9, 20 n.6 (1st Cir. 2012)(quoting Feliciano, 160 F.3d at 786).

Plaintiff did not substantiate the need for this type of accommodation, conceding that she could not work upon expiration of the STD leave.  Once her leave was approved, it was extended four (4) times.  Notwithstanding the extensions, as of the last leave extension request of May 18,

2012, there was no indication that she would be able to return to the job in the near future. Her last authorized extension had expired on April 29, 2012. And then her doctor asserted that the expected duration of plaintiff's need for additional leave was for more than a year.

What plaintiff asked for is not reasonable, contrary to situations where the employee requested a more limited leave extension with an assessment that such period would allow her to return to work. *Compare* García-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 648 (1st Cir. 2000)(denying extension of leave to disabled employee violated the ADA where employee requested on June 10th that the leave be extended until July 30th – the day her doctor expected her to return to work); and Criado v. IBM Corp., 145 F.3d 437, 440-441, 445-446 (1st Cir. 1998)(denying disabled employee extra leave violates ADA where such leave is not expected to be prolonged, and physician represents that employee's condition would improve enough for her to return to work), *with* Robert, 691 F.3d at 1218 (noting that a six (6) month leave request was too long to be considered reasonable accommodation); Hwang, 753 F.3d 1159, 1163 (10th Cir. 2014)(pointing out that the employer did not have to retain an employee unable to perform her essential job functions for six months); and Duckett, 120 F.3d at 1226 (summary judgment dismissing ADA claim of employee who asked employer for two (2) additional months of leave, when he could not show that he would likely be then able to work). The basic idea of a reasonable accommodation is to enable an employee to work, not to not work. Hwang, 753 F.3d at 1162; Byrne, 328 F.3d at 381.

Similarly, open-ended leave extensions do not constitute reasonable accommodation. Henry v. United Bank, 686 F.3d 50, 60 (1st Cir. 2012); Krensavage v. Bayer Corp., 314 Fed.Appx. 421, 426 n. 1 (3rd Cir. 2008)(refusal to grant indefinite leave not a failure to provide a reasonable accommodation); Reifer v. Colonial Intermediate Unit 20, 462 F.Supp.2d 621, 636 (M.D. Pa.

2006)("It is utterly unreasonable and not within the mandate of the ADA to expect and employer to accommodate an employee with an indefinite leave of absence").

Such is what plaintiff's leave extension request essentially looked like, for it did not provide the employer with a near-term solution to her attendance problem, considering the condition her doctor reported she was and expected to be in, for at least the next year.  See, Watkins, 164 F.3d at 61-62 (not advising employer with sufficient specificity that in the immediate future employee would be able to resume her job or an equivalent position amounts to an indefinite leave).  In consequence, plaintiff's claim that AstraZeneca did not reasonably accommodate her by denying the May 2012 request for extension of leave and terminating her employment finds no record support.

Plaintiff argues that AstraZeneca violated ADA in failing to engage in an interactive process (Docket No. 114 at pp. 23-25).  There is no separate cause of action for failure to engage in an interactive process.  Bunn v. Khoury Enterprises, Inc., 753 F.3d 676, 683 (7th Cir. 2014). Those processes are linked to the obligation to provide reasonable accommodation.  See, Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 108 n. 7 (1st Cir. 2005)(noting that a claim that the employer failed to engage in an "interactive process" is a subsidiary theory of the plaintiff's reasonable accommodation claim).  To that extent, they may lead to situations in which the employer's failure to engage in them would constitute a failure to provide reasonable accommodation.  Jacques v. Clean-Up Group, Inc., 96 F.3d 506, 513-515 (1st Cir. 1996).  But as stated above, that obligation was not violated here.

At any rate, requests for accommodation that could not result in a reasonable accommodation do not trigger processes not likely to produce them.  See, Richardson v. Friendly Ice Cream Corp., 594 F.3d 69, 82 (1st Cir. 2010)(plaintiffs must show that the interaction with the

Taymari Delgado-Echevarria v. AstraZeneca, LLP, *et al.*
Civil No. 13-1160 (PAD)
Opinion and Order
Page 33

employer could have led to the discovery of a reasonable accommodation that would have enabled plaintiff to perform the essential functions of her position); Willis, 108 F.3d at 285 ("…[W]here a plaintiff cannot demonstrate 'reasonable accommodation,' the employer's lack of investigation into reasonable accommodation is unimportant")(internal citations omitted); Silva v. City of Hidalgo, 575 Fed. Appx. 419, 424 (5th Cir. 2014)(summary judgment dismissing ADA claim predicated in part on employer's failure to engage in interactive process, since there was no evidence that based on plaintiff's condition, a reasonable accommodation was feasible).   In the end, plaintiff cannot point to the absence of an interactive process which was not likely to generate a reasonable accommodation.   Her representations made it apparent that she would not be able to return to work for twelve (12) additional months.   Therefore, the discrimination claims must be dismissed.

### B.  **ADA's Retaliation claim**

Plaintiff complains of retaliation for having complained to the employer and requesting an accommodation (Docket No. 114 at p. 26).   The ADA makes it unlawful for employers to retaliate against someone who engages in statutorily protected activity.[20]   A plaintiff may assert a retaliation claim even if she is unsuccessful on a disability discrimination claim.   Freadman v. Metropolitan Property and Cas. Ins. Co., 484 F.3d 91, 106 (1st Cir. 2007); Guzmán-Rosario v. United Parcel Service, Inc., 397 F.3d 6, 11 (1st Cir. 2005); Wright v. CompUSA, Inc., 352 F.3d 472, 477 (1st Cir. 2003)(same); Colón-Fontánez, 660 F.3d at 17.

---

[20] Contrary to the ADA, Law 44 lacks a retaliation component.  Vázquez v. Municipality of Juncos, 756 F.Supp.2d 154, 166 (D.P.R. 2010); Franco, 2009 WL 702221, * 31, n. 17.  Puerto Rico has a separate retaliation statute that applies to its anti-discrimination statutes, Law 115, 29 L.P.R.A. §§ 194-197(b); see also, Cardalda-Sánchez v. Universidad Carlos Albizu, 2010 WL 597429, *11, n.10 (D.P.R. February 16, 2010).  Plaintiff, however, withdrew her Law 115 claim.  See, discussion at note 2.

At its core, retaliation may be viewed as a modality of vengeance on account of a prior event, to punish someone because of it.  In the absence of direct evidence, courts evaluate ADA retaliation claims under the burden-shifting framework drawn from McDonnell Douglas v. Green, 411 U.S. 792 (1973).  In line with this framework, plaintiff must show that (1) she engaged in protected conduct; (2) experienced an adverse employment action; and (3) a causal connection exists between the protected conduct and the adverse employment action.  Planadeball v. Wyndham Vacation Resorts, Inc., 793 F.3d 169, 175 (1st Cir. 2015); Kelley v. Correctional Medical Services, Inc., 707 F.3d 108, 115 (1st Cir. 2013).

If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the employment decision. Planadeball, 793 F.3d at 175; Kelley, 707 F.3d at 115.  Should the defendant meet this burden, the plaintiff must show that the defendant's stated reason was a pretext to retaliate against her for having engaged in protected activity.  Kelley, 707 F.3d at 115.  The burden of proving retaliation rests with the plaintiff at all times.

## 1.  **Protected Conduct**

Plaintiff claims that she was retaliated against after: (1) complaining in December 2011; and (2) requesting a prolonged leave of absence in May 2012 (Docket No. 114 at pp. 26, 31). Complaining of discrimination and requesting accommodation are considered protected conduct under the ADA.  Valle-Arce v. Puerto Rico Ports Authority, 651 F.3d 190, 198 (1st Cir. 2001); Colón-Fontánez, 660 F.3d at 36; Wright, 352 F.3d at 478-479.

## 2.  **Loss of STD benefits**

Plaintiff posits that, but-for the "filing" of the internal complaint in December 2011, she would not have lost STD benefits on April 29, 2012 (Docket No. 114 at pp. 26, 27).  The court

assumes that loss of those benefits amounts to an adverse employment action.  In order to establish a causal connection, however, plaintiff must show that the employer acted because she engaged in a protected activity.  University of Texas Southwestern Medical Center v. Nassar, ---U.S.----, 133 S.Ct. 2517, 2523 (2013).  The connection requires proof of a legally sufficient nexus between protected conduct and the alleged retaliatory act.  Colón-Fontánez, 660 F.3d at 36-37; Wright, 352 F.3d at 478.  In proper circumstances, it may be established by temporal proximity between the relevant events. In those cases, the proximity must be very close.  Clark County School Dist. v. Breeden, 532 U.S. 268, 273-274 (2001).[21]

Construing this concept, adverse employment actions more than three (3) months after protected activity have been found insufficiently connected to that particular activity to support a reasonable inference of retaliatory motive.  See, Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 330 (1st Cir. 2005)(no inference of retaliatory motive found when employee began to take leave in October and was not terminated until almost four months later); Perry v. Kappos, 489 Fed.Appx. 637, 643 (4th Cir. 2012)(a mere three-month, one week lapse between events too long to establish causation); Calero-Cerezo, 355 F.3d at 25-26 (concluding that one month was sufficient to satisfy burden of showing causal connection, but noting that three and four-month periods have been held insufficient to establish causation).[22]  In the instant case, approximately five (5) months elapsed between the relevant events.

---

[21] But see, Williams v. Serra Chevrolet Automotive, LLC, 4 F.Supp.3d 865, 879 (E.D. Mich. 2014)(indicating that in light of Gross v. FBL Financial Services, Inc., 557 U.S. 167 (2009) and Nassar, 133 S. Ct. at 2517, temporal proximity alone is not enough to allow a reasonable inference of the but-for causation required to prevail in a retaliation action).  See also Carrero-Ojeda, 755 F.3d at 720 (noting that while temporal proximity is one factor from which an employer's bad motive can be inferred, by itself, it is not enough – especially if the surrounding circumstances undermine any claim of causation).

[22] See also, Strong v. University Healthcare System, LLC, 482 F.3d 802, 808 (5th Cir. 2007)(three and one-half month gap too long); Little v. BP Exploration & Oil Co., 265 F.3d 357, 365 (6th Cir. 2001)(three-month gap too long); Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997)(three-month period insufficient).

Taymari Delgado-Echevarria v. AstraZeneca, LLP, *et al.*
Civil No. 13-1160 (PAD)
Opinion and Order
Page 36

On a different level, plaintiff's request for STD benefits was granted *after* the filing of the internal complaint.  On January 17, 2012, plaintiff was approved STD benefits retroactive to December 12, 2011, and until January 22, 2012.  And these benefits were later extended four (4) times at various points, until April 29, 2012.  They were not extended further because plaintiff failed to submit documentation to adequately support leave extension.  Her leave ended, yet she did not return to work the day she was expected to do so.  As a result, her employment terminated.  No reasonable inference of retaliation emerges from the temporal interplay of the events in question.

The employer may validly terminate the employment of an employee who does not report to work after exhaustion of an authorized leave of absence.  See, Orta-Castro, 447 F.3d at 111 (summary judgment dismissing ADA claim of plaintiff whose employment terminated because she failed to return to work after expiration of authorized leave of absence); Willis, 108 F.3d at 287 (summary judgment dismissing ADA claim of employee who did not show up for work upon expiration of leave despite having been informed that failure to do so would result in job loss).

### 3.  Termination because of her fifth request to extend STD benefits

Plaintiff asserts that but-for her request to extend her STD benefits on May 17, 2012, she would not have been notified on May 18, 2012 of her termination (which became effective on July 19, 2012)(Docket No. 114 at pp. 31, 32).  Termination is considered an adverse action.  Hodgens v. General Dynamics Corp., 144 F.3d 151, 161 (1st Cir. 1998); Jones, 679 F.3d at 21.

On May 8, 2012 – *before* plaintiff's fifth request to extend the STD leave – she was advised that her STD benefits had been terminated for failure to submit supporting documentation.  Additionally, on May 14, 2012 – *before* her fifth request to extend the STD leave – she was advised

that, because her STD benefits had expired on April 30, 2012, if she did not return to work by May 17th, she would be presumed to have resigned from AstraZeneca.

On that basis, there is no connection between plaintiff's fifth request for extension of leave and the employer's decision to terminate her employment, for that decision was made before plaintiff sought the extension. The letter of May 18, 2012 only repeated what plaintiff already knew. A plaintiff must engage in statutorily protected activity before an employer can retaliate against her for engaging in that activity. Serrano v. Donahue, 2014 WL 4924434, *12 (D.P.R. September 30, 2014)(citing Herron v. DaimlerChrysler Corp., 388 F.3d 293, 303 (7th Cir. 2004)). There must be proof that the decision maker knew of the plaintiff's protected conduct when he or she decided to take the adverse employment action." Pina v. Children's Place, 740 F.3d 785, 801 (1st Cir. 2014). One cannot have been motivated to retaliate "by something he was unaware of." Ameen v. Amphenol Printed Circuits, Inc., 777 F.3d 63, 72 (1st Cir. 2015)(quoting Medina-Rivera v. MVM, Inc., 713 F.3d 132, 139 (1st Cir. 2013)).

In this case, the critical decision was made before plaintiff requested the extension, undercutting any support for the view that it came about as a result of her request. See, Freadman, 484 F.3d at 106 ("…[N]o causation can be established based on the June 26 request to work from home, as this request occurred after [manager] had made the decision to remove [plaintiff] from the […] project"). Without causation, plaintiff's claim fails. See, Lebrón v. Commonwealth of Puerto Rico, 770 F.3d 25, 31 (1st Cir. 2014)(dismissing ADA retaliation claim for lack of factual support to plausibly infer that adverse action was causally related to protected conduct); Perry, 489 Fed.Appx. at 644 (summary judgment dismissing retaliation claim due to lack of causation); Rodríguez-Vilanova v. Stryker Corp., 2014 WL 203291, *9 (D.P.R. January 17, 2014)(same).

### 4.  Pretext

Plaintiff asserts that AstraZeneca's grounds for termination are a pretext for retaliation (Docket No. 114 at pp. 32-33, 37).  Pretext analysis is more demanding than the assessment of whether a *prima facie* case has been established.  Fernández-Ocasio, ---F.Supp.3d----, 2015 WL 1442441 at * 9 (citing, Mariani-Colón v. Department of Homeland Sec. ex. rel. Chertoff, 511 F.3d 216, 222 (1st Cir. 2007).  It moves the inquiry to a new level of specificity.  Id. (citing, Kosereis v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003)).

Pretext means something worse than business error.  It means deceit – a lie – to cover one's tracks.  Ronda-Pérez v. Banco Bilbao Argentaria--Puerto Rico, 404 F.3d 42, 45 (1st Cir. 2005)(quoting Kulumani v. Blue Cross Blue Shield Ass'n, 224 F.3d 681, 684 (7th Cir. 2000)); Collazo-Rosado v. University of Puerto Rico, 765 F.3d 86, 97 (1st Cir. 2014).  When assessing a charge of pretext, it must be shown that the employer did not honestly believe in the accuracy of the reason given for the action at issue.  Plaintiff points out that Cohran's letters of May 18, 2012 and July 17, 2012 are inconsistent, and that the inconsistency is probative of pretext (Docket No. 114 at pp. 33, 34).

A relevant variable in evaluating pretext is whether the employer gave different and arguably inconsistent explanations for their actions – unless the record conclusively reveals that the real motive was an unstated reason that is nonretaliatory.  Collazo-Rosado, 765 F.3d at 93. However, there is no inconsistency here.  In the May 18th letter, plaintiff was informed that, as had been stated in a previous letter on May 14th, she had to return to work by May 17th or would be presumed to have resigned from her employment due to termination of STD benefits effective April 30, 2012, and exhaustion of FMLA as of March 4, 2012.  She had not returned to work by the designated date nor contacted her managers, and was offered a severance package available on

account of a reorganization.  In turn, the July 17th letter explained to her that her position was eliminated in the reorganization; described the content of the severance package offered in the May 18th letter; and provided plaintiff with a specific term to sign and return documents.

Nothing in those letters would enable a reasonable jury to find that the reason given by AstraZeneca for not extending the leave beyond April 29, 2012 was a lie intended to cover up a retaliatory motive.  The terms "employment" and "position" are not synonymous.  The position was eliminated, but the employment relationship remained.  It only ended later, when plaintiff did not report to work by the designated return date.  For all that, because the position plaintiff had been assigned to was eliminated during a reorganization while she was on leave of absence, the employer offered her a severance package at termination.  There is no occasion for a finding of pretext.

For plaintiff, the leave extension was denied to punish her for having requested it.  But the argument overlooks the uncontroverted grounds for the employer's decision:  the employee's failure to report to work after exhausting an authorized leave of absence.  Orta-Castro, 447 F.3d at 111; Willis, 108 F.3d at 287.  On that basis, plaintiff's retaliation claim must be dismissed.  See, Ameen, 777 F.3d at 73-74 (summary judgment dismissing retaliation claim for lack of pretext); Collazo-Rosado, 765 F.3d at 94-95 (same).

### C.  Hostile Work Environment

Plaintiff contends that she was harassed after complaining of discrimination on December 23, 2011 (Docket No.114 at pp. 27-30).  The First Circuit has recognized that a hostile work environment tolerated by the employer is cognizable as an adverse employment action.  Noviello v. City of Boston, 398 F.3d 76, 89 (1st Cir. 2005); Quiles-Quiles, 439 F.3d at 8.

A hostile work environment exists when harassment is so severe or pervasive as to alter the conditions of plaintiff's employment and create an abusive work environment.  The conduct must be both objectively and subjectively offensive, such that a reasonable person would find it abusive, and the plaintiff in fact perceived it to be so.  Rivera v. Puerto Rico Aqueducts and Sewers Authority, 331 F.3d 183, 188 (1st Cir. 2003); Ponte v. Steelcase, Inc., 741 F.3d 310, 319-320 (1st Cir. 2014).

Conduct is not measured in isolation.  Clark County, 532 U.S. at 270.  In determining whether a reasonable person would find particular conduct hostile or abusive, a court must null the totality of circumstances, including the severity and frequency of the conduct; whether it was physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interfered with the employee's work performance.  Ponte, 741 F.3d at 319-320; Carmona-Rivera v. Puerto Rico, 464 F.3d 14, 19 (1st Cir. 2006).

To support liability, those circumstances must reflect a workplace permeated with discriminatory intimidation, ridicule, and insult.  National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002); Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 78 (1998). Conduct that is not severe or pervasive enough to create an objectively hostile or abusive environment, an environment that a reasonable person would find hostile or abusive, is beyond statutory purview.  Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993); Oncale, 523 U.S. at 81.  The standard is sufficiently demanding to ensure that employment discrimination statutes not become a general civility code in the workplace.  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).

From this formulation, plaintiff complains of Cohran's call of March 22, 2012 to "pressure" her to return to work and to sign a severance agreement in exchange for a separation package

(Docket No. 144 at pp. 27, 28).  She points out that the call led to a complete disruption of her recovery process, and as such, amounted to prohibited harassment.  Id.  Besides, she argues that Cohran engaged in harassment when he sent the letter instructing her to return to work by May 17th.  Id. at 29.

Objectively, the allegations do not rise to the level of specificity, severity or pervasiveness required to establish a hostile or abusive environment claim under the ADA.  To be actionable, harassment must be based on the protected characteristic; here, on disability.  See, Ríos-Jiménez, 520 F.3d at 44 (plaintiff must show that the alleged hostile conduct was directed at her because of a characteristic protected by an anti-discrimination statute); Rodríguez-Fonseca v. Baxter Healthcare Corp. of Puerto Rico, 899 F.Supp.2d 141, 152 (D.P.R. 2012)(same).  But there is no indication that Cohran attacked, censured, or mocked plaintiff by reference to her disability. Compare Rivera, 331 F.3d at 188 (rejecting religious harassment action for lack of sufficient evidence to link allegedly harassing conduct to religion); and Rodríguez-Fonseca, 899 F.Supp.2d at 152 (summary judgment dismissing hostile work environment claim under ADA, because evidence showed that alleged harassment was based on supervisor's intense workplace demeanor or plaintiff's age instead of disability), with Quiles-Quiles, 439 F.3d at 7 (affirming harassment finding where evidence showed that plaintiff was subject to daily ridicule about his mental impairment); and Arrieta-Colón v. Wal-Mart Puerto Rico, Inc., 434 F.3d 75, 88 (1st Cir. 2006)(affirming harassment verdict where the evidence showed that the plaintiff was subject to constant mockery due to his disability).[23]

---

[23] Plaintiff states Cohran described her reaction to his call as "irrational" and "hysterical."  See, Docket No. 96, Exh. 59 at p. 68, lines 7-10 (where plaintiff acknowledges that she learned of Cohran's characterization of her reaction to his call through a "document" (which plaintiff may have read for the first time during discovery).  Be that as it may, as plaintiff describes it Cohran "acknowledges that he had spoken with me and that I had become hysterical."  Even so, the comment was unremarkable, reflecting his perception of plaintiff's reaction.  And he did not say it to her.  That is not harassment. See, Mason v. S. Illinois Univ. at

In the call, Cohran sought to discuss with plaintiff her leave status and options. In the letter, he advised her of the leave exhaustion and of the need to report to work. Leaves of absence do not erect barriers against communication between employers and employees on leave. In those instances, company officials may gather, convey, and discuss information relevant to the business and personnel administration without raising the specter of discrimination. Wallace v. O.C. Tanner Recognition Co., 299 F.3d 96, 100 (1st Cir. 2002).

It would make little sense to deter such contacts by treating them as evidence of unlawful conduct. Id. (quoting Colosi v. Electri-Flex Co., 965 F.2d 500, 502 (7th Cir. 1992)); Lee-Crespo v. Schering-Plough del Caribe, Inc., 354 F.3d 34, 46 (1st Cir. 2003)(noting that there is nothing unreasonable or harassing in asking an employee on a medical leave of absence to return the company car and other equipment, inventory, and documents); Pérez v. Saint John's School, 814 F.Supp.2d 102, 119-120 (D.P.R. 2011)(communicating with plaintiff while on medical leave regarding money owed to defendant does not rise to level of objectively offensive or hostile behavior necessary to support hostile work environment claim); Schmidt v. U.S. Capitol Police Bd., 826 F.Supp.2d 59, 71 (D.D.C. 2011)(the fact that supervisor and other employees sent plaintiff e-mails, text messages, and telephone messages demanding that she contact them while she was on leave insufficient to support hostile work environment claim). See also, Callison v. City of Philadelphia, 430 F.3d 117, 121 (3d Cir. 2005)(holding that there is no right in the FMLA to be "left alone").

That plaintiff's reaction to Cohran's call resulted in a disruption of her recovery process is unfortunate, but does not carry liability. Harassment actions are ultimately gauged by an objective

---

Carbondale, 233 F.3d 1036, 1047 n. 9 (7th Cir. 2000)(recognizing that comments heard "though the grapevine" or "second-hand" are not sufficiently severe or pervasive so as to create a hostile work environment).

standard.  If the facts on which they are predicated do not objectively cross the unreasonableness threshold, they do not withstand dismissal regardless of plaintiff's subjective interpretation or reaction to the employer's conduct.  See, Bhatti, 659 F.3d at 74 (summary judgment dismissing hostile environment claim of plaintiff who sought psychological counseling on account of workplace events; however, this was evidence of subjective offense; objectively, the employer's conduct never reached the level of abuse).

Like in Bhatti, considering the evidence as a whole, Cohran's call cannot be characterized as abusive, much less harassing.  It was not physically threatening, and even though plaintiff may have perceived it as discomforting, it was not objectively offensive or humiliating.  In the same way, the letter was informative, devoid of language calling into question its propriety as a means of conveying a job-related message.  Where a "workplace objectively falls short of that 'abusive' high-water-mark, it cannot sustain a hostile-work-environment claim." Id.[24]

## D.  FMLA

Plaintiff contends that AstraZeneca interfered with her FMLA rights, and retaliated against her for exercising those rights (Docket No. 1 at p. 14; Docket No. 114 at p. 38).  The FMLA was enacted to help working women and men balance the competing demands of work and personal life. It contains two relatively distinct types of provisions: prescriptive and proscriptive.  The former create substantive rights, whereas the latter provide protection for the exercise or the attempt to exercise those rights.  Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 330 (1st Cir. 2005).  The provisions create two distinct causes of action, to which courts apply different analyses.  Id. at 331.

---

[24] Plaintiff asserts that Cohran should not have "interfered" with her leave because it infringed AstraZeneca's policy (Docket No. 114 at p. 28).  That said, it does not change the analysis in the text.  The ADA is not an impediment to communications between employers and employees on leave of absence, particularly where, as here, the telephone call had a job-related objective.

As to substantive rights, the FMLA entitles eligible employees of covered employers to, *inter alia*, take 12 weeks of leave during any 12-month period for a variety of reasons, and with limited exceptions, to be reinstated to the same position or an alternative position with equivalent pay, benefits, and working conditions, without loss of accrued seniority. Carrero-Ojeda, 755 F.3d at 718.

To ensure these entitlements, the FMLA makes it unlawful for the employer to interfere with, restrain, or deny the exercise of rights under the statute. Id. In such instances, the key issue is whether the employer provided the employee the benefits to which he was entitled under the FMLA, including reinstatement after expiration of protected leave. Id. at 722; see also, Robert, 691 F.3d at 1219, n. 6; Hodgens, 144 F.3d at 159.

In turn, the FMLA's proscriptive provisions protect the entitlements by prohibiting the employer from retaliating or discriminating against employees who have exercised or attempted to exercise rights created by the FMLA. McArdle v. Town of Dracut/Dracut Public Schools, 732 F.3d 29, 35 (1st Cir. 2013); Carrero-Ojeda, 755 F.3d at 718. In the typical retaliation claim, the employee successfully took FMLA leave, was restored to her prior employment status, and was adversely affected by a material employment action post-dating her return to work. Robert, 691 F.3d at 1219 (citing Campbell v. Gambo Healthcare, Inc., 478 F.3d 1282, 1287-1288 (10th Cir. 2007)).

Plaintiff cannot show interference with FMLA rights. She enjoyed the totality of her 12-week entitlement, and did not return to work after exhausting the leave. If an employee fails to return to work on or before the date the FMLA leave expires, the right to reinstatement expires. Silva, 575 Fed. Appx. at 425 (so holding). To this end, in such case, the right to reinstatement has not been interfered with. See, Bellone v. Southwick-Tolland Regional School Dist., 748 F.3d 418,

424-425 (1st Cir. 2014)(employee not entitled to reinstatement under the FMLA if she is unable to return to work until after expiration of leave); James v. Hyatt Regency Chicago, 707 F.3d 775, 781 (7th Cir. 2013)("Employers are under no obligation to restore an employee to [. . .] her position if the employee is unable to perform the essential functions of the job.").

Claims of retaliation for the exercise or attempted exercise of FMLA rights are evaluated under the McDonnell Douglas framework. To make out a *prima facie* case of retaliation, plaintiff must show that (1) she availed herself of a protected right under the FMLA; (2) she was adversely affected by an employment decision; (3) there is a causal connection between the protected conduct and the adverse action. Orta-Castro, 447 F.3d at 113-114 (citing Hodgens, 144 F.3d at 161).

If plaintiff satisfies this framework, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for plaintiff's discharge. Ameen, 777 F.3d at 69; Nilles, 521 Fed. Appx. at 370. If the defendant is able to articulate such a reason, the plaintiff has the burden of showing that the articulated reason is in reality a pretext for retaliating against her for having taken protected FMLA leave. Ameen, 777 F.3d at 69.

Plaintiff claims that her employment terminated because she took FMLA leave (Docket No. 1 at p. 14; Docket No. 114 at p. 38; Docket No. 129 at p. 29). In this connection, she refers the court's attention to her analysis in support of the ADA retaliation claim, insisting that those facts also evince AstraZeneca's retaliation in violation of the FMLA. The court need not tarry long here as the uncontested facts show that, as with her ADA retaliation claim, plaintiff's employment terminated because she did not return to work at the conclusion of leave. See, Hall v. Bausch & Lomb, Inc., 2012 WL 3536755, *4 and *13 (D.Md. August 13, 2012)(summary judgment dismissing wrongful termination claim of employee terminated for failing to return to work after her FMLA leave expired); Silva, 575 Fed.Appx. at 425 (summary judgment dismissing

FMLA retaliation claim; employment terminated due to employee's failure to report for work upon expiration of leave); Robert, 691 F.3d at 1219 (summary judgment dismissing FMLA retaliation claim of employee who failed to return to work after exhausting her FMLA leave).

Although an employee "who properly takes FMLA leave cannot be discharged for exercising a right provided by the statute [she] nevertheless can be discharged for independent reasons." Ameen, 777 F.3d at 73 (quoting Henry, 686 F.3d at 55). Absent retaliatory animus, there can be no pretext. Id. at 74. In the absence of pretext, the retaliation claim fails. See, Carrero-Ojeda, 755 F.3d at 721 (dismissing FMLA retaliation claim for lack of pretext). Because the record is devoid of any evidence that would call into question AstraZeneca's legitimate, non-retaliatory reason for terminating plaintiff's employment, the FMLA claims must be dismissed.

**E. State law claims**

**1. Article 1802 of Puerto Rico's Civil Code**

Plaintiff seeks relief under Article 1802 of the Puerto Rico Civil Code for negligence and intentional infliction of emotional distress (Docket No. 1 at p. 17; Docket No. 114 at p. 39). Article 1802, Puerto Rico's general tort statute, provides in part that a person who "causes damages to another through fault or negligence" shall be liable in damages. P.R. Laws Ann. tit. 31 § 5141. Article 1803 applies the principle of *respondeat* superior to Article 1802 claims. P.R. Laws Ann. tit. 31 § 5142; Pagán-Cólon v. Walgreens of San Patricio, Inc., 697 F.3d 1, 16 (1st Cir. 2012).

As the Puerto Rico Supreme Court, this court, and other courts in this District have held, to the extent a specific labor or employment statute covers the conduct for which a plaintiff seeks damages, she is barred from using the same conduct to also bring a claim for damages under article 1802. See, Santana-Colón v. Houghton Mifflin Harcout Pub. Co., 81 F.Supp.3d 129, 140-141 (D.P.R. 2014)(so recognizing); Pagán-Colón v. Walgreens of San Patricio, Inc., 190 D.P.R. 251,

260-261 (2014)(same).  Given that plaintiff predicates her claim on conduct arguably covered by the ADA, Law 44, and the FMLA, the action under Article 1802 must be dismissed.

### 2.  Law 80

Plaintiff alleges that her employment was terminated without cause under Law 80 (Docket No. 1 at p. 16; Docket No. 114 at p. 41).  The statute makes certain employers liable for payment of an indemnity to employees hired for undefined term who are dismissed without just cause.[25]  It contains a general definition of just cause; provides guidance on the application of this concept to various scenarios related to employee misconduct and performance, reductions-in-force and shutdowns; and imposes on the employer the burden to establish just cause to avoid liability.  P.R. Laws Ann. tit. 29 §§ 185b, 185k.

The general definition of just cause indicates what just cause is not, providing that a discharge made by the mere whim of the employer or without grounds related to the proper and normal operation of the establishment is not to be considered as a discharge for good cause.  Id. at § 185b.  The concept of just cause is dynamic, and its application contextual.  Courts have applied the concept to different scenarios, predicating liability upon the particular factual circumstances underlying dismissal.[26]

Plaintiff maintains that her performance exceeded expectations up until she notified management the diagnosis of a tumor in the pituitary; that she was terminated after she requested an extension of medical leave on May 17, 2012; and that the reasons given for the termination are

---

[25] The indemnity consists of: (A) 2 months' pay plus 1 week's pay for each completed year of service in case of employees with up to 5 years of service; (B) 3 months' pay plus 2 weeks of pay for each completed year of service in case of employees with more than 5 but less than 15 years of service; and (C) 6 months' pay plus 3 weeks' pay for each completed year of service in case of employees with 15 or more years of service,  P.R. Laws Ann. tit. 29 § 185(a).  See, Soto-Lebrón v. Federal Express Corp., 538 F.3d 45, 55 (1st Cir. 2008)(describing the Law No. 80 compensation formula).

[26] For a detailed and comprehensive discussion of this topic, see Jorge L. Capó-Matos, in M.J. Caterine (ed.), *Employment at Will: A State-by-State Survey*-Puerto Rico Chapter (2011), pp. 936-969.

unworthy of credence (Docket No. 114 at p. 41).  The argument touches on different aspects of plaintiff's theory that have already been discussed, and rejected.  In that regard, they do not support the view that termination was divorced from legitimate management objectives to the point of making AstraZeneca liable under Law 80.

Pursuant to AstraZeneca's STD Policy, plaintiff was responsible for providing the medical information necessary to substantiate the STD claim (Docket No. 96, Exh. 3 at Section 3.1). Similarly, the Policy states that if the STD benefits are terminated or denied and the employee does not return to work, the employee may be considered to have abandoned the job and be subject to immediate termination from employment.  It is uncontested that plaintiff's benefits terminated. She did not appeal that decision to the Policy Administrator as she was informed she could, and failed to return to work by the date she was expected be back on the job.  Not having reported to work on such date without authorization is the functional equivalent of having implicitly resigned from or abandoned the job.  In either case, she is not entitled to relief.

Employers may validly expect employees to report to work after a leave of absence, and to interpret the employee's failure to so report as a decision by the employee to part ways and end the employment relationship.  The link between the two (2) events is not arbitrary. Instead, it is reasonably related to the proper management of the enterprise.  In the end, it allows the employer to know with relative certainty by a specific date, what human resources are available in the organization to adequately plan and conduct its operations; and to assign and allocate assets in response to shifting and competing market demands.  The interaction of these elements configure just cause for termination under Law 80.  With that in mind, the Law 80 claim must be dismissed.

## V.        CONCLUSION

Entry of summary judgment is appropriate when the record shows absence of genuine factual dispute as to material facts requiring a trial.  Such is the case here.  Plaintiff cannot prevail as a matter of law. On that basis, AstraZeneca's motion for summary judgment (Docket No. 97) is GRANTED, and plaintiff's claims DISMISSED.

Judgment shall be entered accordingly.

**SO ORDERED.**

In San Juan, Puerto Rico, this 30th day of September, 2015.

s/Pedro A. Delgado-Hernández
PEDRO A. DELGADO-HERNÁNDEZ
United States District Judge